UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/16/2021

UNITED STATES OF AMERICA,

v.

JASON MOJICA,

Defendant.

No. 19-CR-280 (RA)

FINDINGS OF FACT &
CONCLUSIONS OF LAW

RONNIE ABRAMS, United States District Judge:

On December 20, 2019, defendant Jason Mojica, having been found guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), was sentenced to 15 months' imprisonment and three years of supervised release. Dkt. 24. The mandatory conditions of his supervised release include the requirement that he not commit another federal, state, or local crime. The Government now charges that Mojica has committed ten state crimes since he was released from prison on March 25, 2020.

Specifically, the Government alleges that, four days after his release from prison, Mojica stabbed a man ("Individual 1") in the back with a knife, in violation of New York Penal Law ("NYPL") §§ 110.125.25(1) (Attempted Murder), 120.10(1) (Assault in the First Degree), 120.00 (Assault in the Third Degree), 265.02 (Criminal Possession of a Weapon in the Third Degree), 120.14(1) (Menacing in the Second Degree), and 240.26(1) (Harassment in the Second Degree), and that he subsequently conspired to induce the victim of that stabbing to refuse to testify, in violation of NYPL §§ 215.00 (Conspiracy to Bribe a Witness), 215.11 (Conspiracy to Tamper with a Witness in the Third Degree), 215.15 (Conspiracy to Intimidate a Victim or Witness in the Third Degree), and 215.10 (Conspiracy to Tamper with a Witness in the Fourth Degree). Mojica

maintains that he is innocent of all the alleged violations.  Accordingly, the Court conducted an evidentiary hearing on February 22, 2021.

The Government bears the burden of proving by a preponderance of the evidence that Mojica violated a condition of his supervised release.  18 U.S.C. § 3583(e)(3); *see, e.g., United States v. Hightower*, 950 F.3d 33, 37 (2d Cir. 2020).  Based on the parties' submissions and hearing testimony, including the Court's assessment of the credibility of the witnesses and the reliability of the statements introduced, the Court finds that the Government has met its burden with respect to specifications 3, 4, 5, 6, 7, and 10 but not specifications 1, 2, 8, and 9.

## BACKGROUND

### I. Procedural History

On April 3, 2020, nine days into his term of supervised release, Mojica was arrested by the New York City Police Department ("NYPD") based on allegations that he stabbed Individual 1 on March 29, 2020 at approximately 2:10 p.m. in front of 527 East 137th Street, Bronx, New York. The Bronx County District Attorney's Office has since dismissed all charges relating to that incident because Individual 1, the putative victim in the case, refused to cooperate with the prosecution.

On April 15, 2020, the Probation Department requested a warrant to arrest Mojica for the following six alleged violations of supervised release: 1) attempted murder; 2) first degree assault; 3) third degree assault; 4) third degree criminal possession of a weapon; 5) second degree menacing; and 6) second degree harassment.  Mojica was brought into federal custody on August 28, 2020, where he remains incarcerated without bail.  On September 16, 2020, Mojica appeared before this Court and pleaded not guilty to all specifications in the violation report.  Following

several adjournments and the appointment of new counsel, the Court scheduled an evidentiary hearing for February 22, 2021.

On February 19, 2021, the Government disclosed audio recordings it had obtained of various phone calls made between April 6, 2020 and November 24, 2020 by Mojica from Rikers Island and Essex County Jail, as well as transcripts of those calls.  Upon review of the calls and the transcripts and in consultation with the Government, the Probation Department concluded that Mojica had engaged in multiple instances of conspiring to tamper, intimidate, and bribe the victim of specifications 1-6, Individual 1.  Accordingly, on February 19, 2021, the Probation Department submitted to the Court an amended violation report which included four new specifications, each corresponding to a violation of New York state law: 7) conspiracy to bribe a witness; 8) conspiracy to tamper with a witness in the third degree; 9) conspiracy to intimidate a victim or witness; and 10) conspiracy to tamper with a witness in the fourth degree.  The Government also submitted to the Court pictures of Individual 1's injuries, medical records from Individual 1's hospital visit, and a NYPD body camera recording from the scene of the stabbing.  In a February 21, 2021 letter, the Government indicated its intention to elicit the testimony of two law enforcement witnesses who had interviewed Individual 1 after the incident.  *See* Dkt. 44 ("Government Letter").

In a letter motion dated February 22, 2021, Mojica objected to any testimony about Individual 1's out-of-court statements on the grounds that such statements constitute unreliable hearsay, and the interests of justice do not weigh in favor of their admission.  *See* Dkt. 45 ("Defense Letter").  Reserving decision on whether Individual 1's hearsay statements ultimately would be admitted into evidence, the Court permitted the Government's witnesses to testify at the February 22, 2021 hearing.  With Mojica's consent, and pursuant to the authority provided by Section 15002

of the CARES Act and the standing orders issued by Chief Judge McMahon pursuant to that act, the proceeding was conducted remotely.

## II.      The Evidence

### A.      Testimony of Jeff Grater

The Government began the evidentiary hearing by calling Detective Jeff Grater of the NYPD's 40th Precinct.  Grater testified that he was dispatched to 527 East 137 Street in the Bronx on March 29, 2020 to investigate the stabbing of Individual 1, and that he first met Individual 1 at Lincoln Hospital on the following day.   During that interview, Individual 1—whom Grater described as calm and relaxed in his demeanor—stated that on the day of the incident he met up with his friend "J" on East 137 Street and they went inside a nearby stairwell to shoot up crack and heroin.  Individual 1 told Grater that he then left that location, leaving J inside.  Sometime later, J reemerged and accused Individual 1 of stealing his bracelet.  A verbal dispute escalated into a physical fight.  When Individual 1 saw that J appeared to have a knife in his hand, he tried to run away, but J chased him down and stabbed him once in the back.

According to Grater, Individual 1 explained that he had known J from the neighborhood for a little over two years, that J had a cross and teardrop tattooed on his face, and that he had recently been "released from the feds."  *See* Dkt. 48, Transcript of February 22, 2021 Hearing ("Tr.") 15.  Grater testified that he plugged that information in a computer check and identified Mojica as a potential suspect who fit the description provided by Individual 1.  When Grater showed Individual 1 a photo of Mojica, Individual 1 apparently said: "That's J.  He stabbed me." Tr. 16.  Grater stated that he has not spoken to Individual 1 since April 5, 2020, despite numerous attempts to reach him by phone and a canvassing of the area in which the incident occurred.

On cross-examination, Grater testified that his initial conversation with Individual 1 at Lincoln Hospital lasted only twenty minutes, and that his second meeting with Individual 1 on the day of Mojica's arrest was conducted by phone. Grater clarified that he had obtained the name "J" prior to his initial conversation with Individual 1, from talking to the officers at the scene.

Grater stated that his description of the altercation between Mojica and Individual 1 was based solely on statements made by Individual 1, and that he had not been able to obtain any information from any of the men who were standing in front of the deli when police officers arrived to investigate the stabbing. Pressed on cross-examination about his knowledge of who started the fight, Grater testified that Individual 1 had reported that J came at him, that it "did get physical," and that Individual 1 tried to get away from J when he saw a knife. Tr. 22. With regard to the identification, Grater testified that he had the photo of Mojica in his possession prior to the Lincoln Hospital interview, and that he presented Individual 1 with that single photo rather than a lineup spread. Grater further affirmed that he did not confront Individual 1 with his prior convictions, criminal history, or open warrants.

### B.   Testimony of Shauna Payyappilly

The Government next called Bronx County Assistant District Attorney ("ADA") Shauna Payyappilly, who participated in the investigation of Mojica. Payyappilly testified that she spoke with Individual 1 approximately ten times by phone, in addition to numerous text exchanges. According to Payyappilly, Individual 1 told her that he met up with Mojica on March 28, 2020 and that the two went to a stairwell to take drugs, at which point Mojica took all the drugs and passed out. Individual 1 subsequently left and went to work. Individual 1 told Payyappilly that he had known Mojica, whom he referred to as J, for over a year from the neighborhood and that the two did drugs together. In his description of the incident to Payyappilly, Individual 1 stated that Mojica

approached him in front of a deli on March 29, 2020 and confronted him about stealing a watch or a bracelet the day before.  When Individual 1 denied the theft, Mojica started punching him, and Individual 1 punched back.  According to Payyappilly, Individual 1 described the dispute as "just a fight" until Mojica pulled out a knife, at which point Individual 1 turned to run away and felt a stab in his back.  Tr. 30.

When asked about the nature of her contact with Individual 1, Payyappilly stated that she had spoken with him three or four times about the substance of what happened, describing his accounts as consistent.  Although Individual 1 told Payyappilly that he uses heroin daily, he claimed to not have been high on the day of the incident because he was about to go to work. Explaining Individual 1's failure to cooperate in the state prosecution of Mojica, Payyappilly testified that Individual 1 told her multiple times that he was fearful for his safety and "afraid of retribution just on the streets overall." Tr. 33.  Individual 1 told Payyappilly that he "wasn't afraid of [Mojica]." *Id.*  Payyappilly explained that she last spoke with Individual 1 in late July 2020, but has been unable to locate him since, despite multiple attempts to reach him.

On cross-examination, Payyappilly testified that she had never met Individual 1 in person, although she acknowledged that being in the room during an interrogation may facilitate the assessment of a defendant's truthfulness.  As a result, Payyappilly was not able to judge Individual 1's non-verbal cues or how he comported himself during interviews.  She did, however, confront Individual 1 with his prior arrests and convictions, and was aware of his open warrant for misdemeanor trespass.  Upon review of Individual 1's rap sheet, which the Court entered into evidence as Defense Exhibit A, Payyappilly stated that the warrant was issued in October 2019 and it remained open as of the date of the hearing.  The Court subsequently entered Defense Exhibit B into evidence, which depicted body camera footage from NYPD Officer Abreu.  Payyappilly

testified that she had reviewed the body camera footage, which showed about five to seven other people in front of the deli when the police arrived.  She testified that she had never questioned any of those individuals.

Confirming that Mojica had no objections to the other evidence provided by the Government, the Court entered Government Exhibits 1-7 into evidence.  The Government subsequently rested its case.  After Mojica confirmed to the Court that he did not wish to exercise his right to testify or put on a case, the Court adjourned the hearing.

### C.    Government Exhibits 1-2: The Jail Calls

Government Exhibits 1 and 2 consist of various recordings and transcripts of jail calls between Mojica and several other individuals.  On the first call, dated April 6, 2020, Mojica tells an unidentified female "I just threw my whole life away for a fucking bracelet," and agrees that he "should've left the kid alone."  Government Exhibit ("GX") 1A-T at 1-2.  Later on that call, Mojica states "I'm just hoping homeboy don't show up in court."  *Id.* at 4:2.  The following day, Mojica tells an unidentified female that "the guy that, allegedly, that happened to, he's not telling them exactly what happened. He's just saying what I did. He's not saying what he did to me."  GX 1B-T at 3:4-7.  Mojica then explains that "[h]e's from Mill Brook. I just can't believe that n---- told, like, I thought I was good, all that time went by, police didn't come to my house looking for me, I thought I was good."  *Id.* at 3:9-12.  Later in the call, Mojica says "he's trying to say that, he's trying to say that he was running from me, and I ran him down and stabbed him which wasn't the case. He came up to me, he came up to me aggressively, he started everything."  *Id.* at 4:19-22.

On April 8, 2020, Mojica, referring to "that shit that happened at the store the other day," tells an unidentified female that "I just threw my life away for a fucking bracelet."  GX 1C-T at 1-2.  Mojica then says that if an unspecified woman would have come that day, "I would have never

done it, never retaliated on the n----." *Id.* at 3:7-8. When asked "where did you poke him," Mojica responds "allegedly he got stabbed in his back, and he got, um, he had to have surgery because his lung got punctured." *Id.* at 3:14-19. Mojica then explains "[w]hat he's saying is, he trying to run from me, and I ran him down, which none of that's true. When they get the camera from the store, they gonna see what's up." *Id.* at 3:23-25. On an April 9, 2020 call, after stating that "it was dumb, it was dumb, I regret it," Mojica says that "on that block . . . [n]----s used to me going through, being high all the time, and n----s kept doing shit to me and it was like enough is enough." GX 1D-T at 2:11-13.

On April 10, 2020, Mojica tells an unidentified female that he's going to "holler at Rick, Rick go there, Rick holler at [UI] You can't do that. You can't, you can't rob somebody and then go to the police when something happen to you." GX 1E-T at 2:11-14. Mojica then says "I'm probably gonna have to offer that n---- some money or something" after which the unidentified female says "I hope you know that all this shit is being recorded on this motherfucking line." *Id.* at 2:17-18, 22-23. Explaining why he is in jail to an unidentified male on April 12, 2020, Mojica says "n---- did something. I let what that n---- did to me, I let that go too far with it," and then agrees that he "caught" "the n---- with the bracelet." GX 1H-T at 1:19-25. Mojica then says "[t]hey got me on camera and all that, that shit is bad, it's bad, yo." *Id.* at 2:4-5.

On an April 13, 2020 call, Mojica tells Rick that "Somebody gotta pull up on him and tell n---- that n----s will drop a bag." GX 1I-T at 2:4-5. Rick responds that "I already been doing that. I'm tryna find homie, son" and that "I been riding my bike over there and shit. . . . I'm gonna find him, son." *Id.* at 2:15-17. Mojica tells Rick that he "can't pull on boy" to which Rick responds "Nah, don't worry about it. I'm gonna do all of that. I remember how that n---- look." *Id.* at 3:3-7.

After Rick passes the phone to a woman named Essy, Mojica tells her "Yo make sure Rick does that. Keep putting that shit in his ear." *Id.* at 5:3-4.

On April 16, 2020, Mojica says to an unidentified female "[l]ucky she didn't find her chain that day because that woulda came up missing too and it woulda been worse. I woulda did him even worse." GX 1L-T at 1:13-16. Mojica asks an unidentified female on April 21, 2020, "What's up with Rick? He ain't gonna do the right thing?" GX 1M-T at 1:2-3. During an April 27, 2020 phone call, Mojica says that "[Rick] need to go, he need to go down to Mill Brook every motherfucking day and fix this, man. He's the only -- the only way I'ma get out of this is if he go fix this." GX 1O-T at 2:24-3:3. The unidentified female responds, "I have to be on top of him. I'll be like, yo, n----, go do what you gotta do because [Mojica] is in there suffering and you need to fucking regulate this because you a fucking witness, n----." *Id.* at 7:23-8:3.

Two days later, Mojica tells Rick to "Holla at Old Boy. You know I can't say too much on this phone." GX 1P-T at 2:13-14. Rick responds "I still been over there. I haven't seen him. I'm tryna figure out who was, who was the other n----," *id.* at 2:15-17, adding "I ain't see other homie since I've been gone over there, bro . . . . But I been seeing, I been seeing the homie n----s that was out there and shit. You know, I been asking and shit." *Id.* at 3:9-19. When pressed by Mojica, Rick states "I be down there every day though. Fuck. I'm trying to get, I'm tryna get the drop." *Id.* at 4:10-12. Mojica tells Rick "I sent a kite to Essy's house for you, so be looking out for some mail . . . . I can't speak on the phone like that so I sent you a kite." *Id.* at 5:14-18. Later on that call, Mojica tells an unidentified female, "I sent a letter to your house," and to "let [Rick] read that letter in front of you," and then to "take it back from him and throw it away." *Id.* at 12:24-13:7.

On a May 4, 2020 call, Mojica tells an unidentified male that he's locked up because "[n]----s robbed me my first day out and I holla'd -- . . . . I holla'd at the n---- and he went to the police."

GX 1Q-T at 1:9-13.  Referring to Rick on a May 9, 2020 call, Mojica tells an unidentified female that "I wanted somebody to be there with me when that shit went down. I felt like calling. He was closest."  GX 1-R.  On May 11, 2020, Mojica tells an unidentified female "the key to getting me out of here be in and out of your house" to which the female responds "motherfucker ain't budging. What do you want me to do? Shoot him?"  GX 1-S.  On a subsequent call, after saying "that that shit happened my second day out," Mojica says that "I been knowing the n---- for years," and that he's "[o]ne of my get high buddies."  GX 1T-T at 1:11-14.  On May 24, 2020, Mojica tells an unidentified female "[e]very now and then I call Rick because I been trying to get him to holla at homeboy." GX 1V-T at 1:3-4.

### D.    Government Exhibits 3-4: Medical Records

Government Exhibit 3 is an email from Detective Grater to ADA Payyappilly, with the subject line "Injuries," that depicts three pictures of a wound sutured with staples.  Government Exhibit 4 consists of medical records from Lincoln Hospital in the Bronx.  The medical records, which purportedly belong to Individual 1, indicate that the patient was admitted to the hospital on March 29, 2021 at 2:57 p.m. and discharged on April 1, 2020 at 1:14 p.m.  Those records describe the patient's past history as an "IV drug user" with "Opioid use disorder."  GX 4 at 2, 3.  According to the exhibit, the patient was diagnosed with an approximately four-centimeter stab wound of the left lower back.  "The patient was then taken to the OR for diagnostic laparoscopy (negative for intraabdominal or diaphragmatic injuries) and L thoracostomy tube placement."  GX 4 at 7. Following surgery, the patient was "breathing comfortably, stab wound sites clean, with staples in place."  *Id.*  On March 31, 2020, the attending physician noted that the patient presented with "[n]o respiratory distress, remaining vitals stable."  *Id.* at 9.

### E.   Body Camera Footage

Government Exhibit 5 and Defense Exhibit B depict NYPD body camera footage from the scene of the incident on March 29, 2020, spanning from approximately 2:18 p.m. until 2:22 p.m. As each exhibit depicts body camera footage from a police officer who arrived on the same scene during the same timeframe, the content is largely identical.  When the police arrive, Individual 1 is standing outside of the deli.  One of the police officers lifts Individual 1's shirt to view the wound and remarks "it's little, it's like a little one."  In response to inquiries from police officers, Individual 1 states "I just had a fight . . . .  he started hitting me . . . . so when he saw that I fought back, he pulled out a knife and stabbed me."  *See* GX 5, Defense Exhibit B.  Individual 1 does not provide any audible response when asked whether he knows the man who fought him.  Five or six young men are standing outside the deli, but none respond to the officers' inquiries about what happened.  A man behind the deli counter also appears to indicate that the camera in the deli doesn't work.  Individual 1 is then helped into an ambulance, at which point the footage comes to an end.

### F.   Government Exhibits 6-7

Government Exhibit 6 is a stipulation by the Government and Mojica that Government Exhibits 1 and 2 are true and complete recordings of phone calls made by Mojica from jail, that Government Exhibit 3 depicts injuries sustained by Individual 1, that Government Exhibit 4 relates to the treatment of Individual 1, and that the individual depicted as injured in Government Exhibit 5 is Individual 1.  Government Exhibit 7 consists of a stipulation by both parties that the Government has taken numerous steps to locate Individual 1, including speaking with his family members and surveilling locations he is believed to frequent.

11

### G.      Defense Exhibit A: Individual 1's Rap Sheet

Defense Exhibit A, Individual 1's New York State Criminal History Information, indicates that Individual 1 has 33 convictions on his record, including 2 felonies.  The rap sheet also indicates that a bench warrant for his arrest was issued on October 10, 2019 for third degree criminal trespass.  According to the records, Individual 1 was convicted, *inter alia,* of criminal possession of a weapon in the fourth degree in 2007 and again in 2009, and of criminal possession of a controlled substance in the seventh degree on multiple occasions between 2007 and 2008, as well as multiple other similar crimes.

### DISCUSSION

## I.      Admissibility of Individual 1's Out-of-Court Statements

Mojica argues that the Court should not admit Individual 1's hearsay statements into evidence because they are unreliable.  Specifically, he contends that Individual 1's extensive criminal history casts doubt on the truthfulness of his statements, and that his absence from the evidentiary hearing reflects a fear of perjuring himself as well as a desire to evade the open arrest warrant.  For the reasons that follow, the Court finds that the statements are admissible as evidence.

A defendant in a revocation hearing is entitled, *inter alia,* to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C).  The Federal Rules of Evidence do not apply in such a proceeding.  *See, e.g., Hightower*, 950 F.3d at 37.  At a revocation hearing, the Court may consider out-of-court statements that do not qualify as hearsay. *See, e.g., United States v. Carthen*, 681 F.3d 94, 100 (2d Cir. 2012).  If the evidence does qualify as hearsay, however, Rule 32.1 requires the Court to determine whether good cause exists to deny the defendant the opportunity to confront the witness.  *See id.*  In making that determination, the

Court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay. *See United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006). In the balancing process, the defendant's interest in confronting the declarant is entitled to little, if any, weight where the declarant's absence is the result of intimidation or "chicanery" by the defendant. *Id*.

In light of the ample evidence of Mojica's attempted witness tampering in this case, the Court places little weight on Mojica's interest in confronting Individual 1. The records of Mojica's calls from jail—which are themselves admissible as non-hearsay party-opponent statements, *see* Fed. R. Evid. 801(d)(2)—demonstrate Mojica's repeated efforts over a period of at least a month to get Rick to "holler at," *see* GX 1E-T at 3:11-14, or "pull up on" Individual 1, and to "drop a bag," *see* GX 1I-T at 2:4-5, along with his hope that "homeboy don't show up in court," GX 1A-T at 4:2. The only reasonable inference that the Court may draw from these statements is that Mojica was attempting to prevent Individual 1 from cooperating with law enforcement. On multiple occasions, Mojica tells his female counterpart to "make sure Rick does that," *see* GX 1I-T at 5:3-4. As late as May 24, 2020, Mojica admits to calling Rick "[e]very now and then" to try "to get him to holla at homeboy." GX 1V-T at 1:3-4. For his part, Rick tells Mojica on April 29, 2020 that he has been "going there every day" and is "tryna get the drop." GX 1-P at 4:10-12. Those statements, coupled with ADA Payyappilly's testimony that Individual 1 expressed a reluctance to cooperate borne out of a fear of retaliation, allow the Court to infer that Individual 1's absence from the revocation hearing may be, at least in part, attributed to Mojica. The Court finds that fear of retaliation is a more likely explanation for Individual 1's absence than his fear of giving false testimony or arrest on the open bench warrant.

Accordingly, the Court finds that "the [G]overnment's reasons for not producing" Individual 1 to testify at the revocation hearing weigh in favor of accepting the out-of-court statements. *See Williams*, 443 F.3d at 45. Given Individual 1's professed fear that cooperation with the investigation would result in retaliation, Mojica's documented attempts to relay this very message to Individual 1, and Mojica's history of violent conduct—which includes four convictions for assault including one on a child under 12—the Court finds that good cause exists to justify the absence of Individual 1. *See Carthen*, 681 F.3d at 101 ("We have held that good cause justifying the absence of a declarant exists when a defendant has a history of violent conduct that makes reprisal against the declarant a possibility.").

The Court further finds that Individual 1's out-of-court statements are sufficiently reliable for admission. As an initial matter, the Court deems the two witnesses to be credible, a determination that Mojica does not appear to dispute. More importantly, the Court finds Individual 1's account to be detailed, consistent, and corroborated. Individual 1 provided his first account of the stabbing as he waited for an ambulance minutes after the incident, as indicated by the body camera footage. *See* GX-5. The key details of his account of the stabbing—that a man started a fight with him on the street, that he began to fight back, and that the man pulled out a knife and stabbed him in the back—remained consistent in the following days as he recounted the story to Detective Grater and ADA Payyappilly. Medical records, photographs, and body camera footage corroborate that Individual 1 was stabbed in the back, just as he described. The Court also finds Individual 1's identification of Mojica to be reliable, given that Mojica himself admits that the two men knew each other. Indeed, Mojica's statements corroborate many other aspects of Individual 1's account, namely that the two knew each other from the neighborhood and did drugs together,

and that Mojica fought with Individual 1 based on the belief that Individual 1 had stolen his bracelet.

In challenging the reliability of Individual 1's statements, Mojica focuses on Individual 1's extensive criminal record, and his "30-year history of stealing, possessing weapons, and involvement with selling and possessing drugs." *See* Defense Letter.  Mojica argues that these factors indicate that Individual 1 would lie if asked by law enforcement whether he started the fight.  While Individual 1's history of criminality may raise legitimate questions about his capacity for truthfulness, the Court finds that such concerns are outweighed here by other indicia of reliability, namely the consistency of his statements and their corroboration by other evidence in the record.  Consequently, the Court will consider the out-of-court statements as evidence.  *See Carthen*, 681 F.3d at 100 (admitting "hearsay portions of [] evidence" that "were detailed, credible" and "corroborated by other evidence").

## II.     Specifications 1-6:  The Stabbing

### A.      Justification Defense

Mojica raises a justification defense, arguing in his closing statement that he acted in self-defense when he stabbed Individual 1.  Before analyzing whether the Government has met its burden of proof on the counts related to the stabbing, the Court must first determine whether such a defense is applicable in this case.

Pursuant to NYPL § 35.00, justification is a "defense."  As relevant here, "[a] person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself . . . from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person."  *Id.* § 35.15(1).  The defense is unavailable, however, if "the actor was the initial aggressor."  *Id.* § 35.15(1)(b).  "When a

'defense,' other than an 'affirmative defense,' defined by statute is raised at a trial, the people have the burden of disproving such defense beyond a reasonable doubt."  NYPL § 25.00.

The parties dispute who bears the burden of proving justification in the context of a federal revocation hearing.   The Government contends that "self-defense is an affirmative defense requiring the defendant to show that he reasonably believed that his force was necessary to prevent what he reasonably believed to be the use of unlawful physical force."  Tr. 79.  To support that contention, the Government cites an order granting summary judgment to defendants in a § 1983 case, in which Judge Rakoff describes self-defense as an "affirmative defense."  *Moscoso v. City of New York*, 92 F. Supp. 2d 310, 314 (S.D.N.Y. 2000).  Mojica, citing the model jury instructions for the relevant section of New York Penal Law, argues that the Government bears the burden of disproving justification.  Tr. 67.

The New York Court of Appeals has described "justification under the Penal Law [as] an ordinary defense rather than an affirmative one. . . .  As such, whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged."  *People v. McManus*, 67 N.Y.2d 541, 546 (1986); *compare* NYPL § 35.00 (describing justification as a "defense") *with* NYPL § 135.30 (describing "affirmative defense[s]" to kidnapping).  A criminal defendant in New York is not, however, automatically entitled to have a factfinder consider a justification defense.   "A justification charge is warranted, 'if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified.'"  *Jackson v. Edwards*, 404 F.3d 612, 622 (2d Cir. 2005) (quoting *People v. Padgett,* 60 N.Y.2d 142, 145 (1983)).  "When evidence at trial viewed in the light most favorable to the accused, sufficiently supports a claimed defense, the court should instruct the jury as to the defense, and must when so requested."  *People v. Watts*, 57 N.Y.2d 299, 301 (1982).  "As a corollary, when

no reasonable view of the evidence would support a finding of the tendered defense, the court is under no obligation to submit the question to the jury." *Id.*

Neither party has specifically addressed how the burden of proving justification operates in the context of a revocation hearing. Analogizing from the context of a criminal trial, however, the supervisee bears the initial burden of raising a justification defense. If the record, assessed in the light most favorable to the supervisee, would permit a reasonable factfinder to conclude that the supervisee's actions were justified, the burden then shifts to the Government to disprove justification by a preponderance of the evidence. The Court as factfinder will then consider the merits of the supervisee's defense. Applying that standard, the Court assumes without deciding that Mojica has met his initial burden of raising a justification defense. Mojica relies on various statements that he made that suggest either that Individual 1 was the initial aggressor in the altercation, or that Individual 1 reached for a gun immediately before the stabbing. The Court views these statements in the light most favorable to Mojica and assumes that a reasonable factfinder could decide that his actions were justified.

Having considered that defense on the merits, however, the Court finds that the Government has sufficiently disproved justification. There is no dispute that Individual 1 was stabbed in the back. Such an injury is itself generally inconsistent with self-defense. Furthermore, there is no credible evidence supporting the contention that Mojica reasonably believed that stabbing Individual 1 in the back was necessary to defend himself. Mojica addressed this anomaly in his closing statement, arguing that Individual 1 turned to ask his friends for a gun, which impelled Mojica to act in his own defense. This version of events finds little support in the record. The only reference to a gun in evidence is a statement by Mojica during an April 8, 2020 call with an unidentified female:

17

No, I - he told him that, that the reason I did that to him is because I think that, allegedly, I'm saying that he robbed me, but then on the camera what it's gonna show, it's gonna show him with [UI], I was walking by, he pulled up to me, you already know what happened, he pulled up to me, he came up to me aggressively whatever, whenever we started fighting and shit, he turned around. When he turned around, he asked one of the n----s to pass him a gun. And that's when I, that's when whatever happened, happened.

GX 1C-T at 4:18-5:2.   That discussion immediately follows Mojica's statement that the camera footage was either going to help him or hurt him, to which the unidentified female responds "[r]ight, right, *so you could say that*, just prior to that, he had you in a stairway with a gun to you . . . . . *You feel me*, and he tried to rob you . . . .   Just cause they see that on camera, they don't know what happened before that though."  *See id.* at 4:5-17 (emphases added).  Read in context and in light of Mojica's use of the word "allegedly," the Court interprets the account as a contrived story to exonerate Mojica for the stabbing rather than a recitation of the truth.  The Court thus accords no weight to this isolated statement about a gun.

Nor does the Court credit the handful of other statements made on the phone in which Mojica describes Individual 1 as the initial aggressor.  That description is not only inconsistent with Individual 1's contemporaneous description of the stabbing, but also with numerous other statements made by Mojica that the fight was motivated by Individual 1's theft of a bracelet, including the statements he made on the first recorded phone calls that he "just threw [his] whole life away for a bracelet."  GX 1A-T at 2; *see also* GX 1C-T at 2.  As no other piece of evidence explains how the stabbing of Individual 1 in the back constituted a defensive act, the Court cannot conclude that Mojica "reasonably believe[d] such to be necessary to defend himself," NYPL § 35.15.  In sum, by providing evidence as to the nature of the injury, Mojica's motive to initiate an altercation with Individual 1, Mojica's incriminating statements, and Individual 1's contemporaneous account of the stabbing, the Government has met its burden of disproving justification.

### B.      Specification 1: Attempted Murder in the Second Degree

Specification 1 charges Mojica with attempted murder in the second degree.  In New York, "[t]he crime of attempted second degree murder is committed when, with the intent to cause the death of another person, one engages in conduct which tends to effect commission of that crime." *People v. Fernandez*, 88 N.Y.2d 777, 783 (1996) (citing NYPL §§ 110.00, 125.25(1)).  As the Government conceded during the evidentiary hearing, because there is no "direct evidence" that Mojica acted with the intent to cause to the death of Individual 1, "it would be reasonable for the Court to find the evidence insufficient" as to the element of intent.  Tr. 54.  The Court agrees, and concludes that the Government has failed to carry its burden of proving Mojica's guilt on the first specification.

### C.      Specification 2:  First Degree Assault

The second specification charges Mojica with violation of NYPL § 120.10(1), "Assault in the first degree."  "A person is guilty of assault in the first degree when . . . . with intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of a deadly weapon or a dangerous instrument."  "Serious physical injury" is defined in the New York Penal Law as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  NYPL § 10.00(10).

The Court finds the evidence insufficient to demonstrate that Individual 1's injuries qualify as "serious" within the statutory definition.  Courts interpreting the New York Penal Law have found that injuries qualify as "serious" when they present "a substantial risk that [the victim] could have died from his wounds without medical attention."  *Santone v. Fischer*, 689 F.3d 138, 149 (2d Cir. 2012).  Accordingly, evidence that stab wounds are life-threatening is generally sufficient

19

proof of the seriousness of an injury.  *See id.* at 149-50 (citing cases).  A stab wound, however, is not necessarily a serious injury under the statutory definition.  The Appellate Division, Second Department, for example, has found that stab wounds do not constitute serious physical injury when they do not cause organ damage or otherwise threaten the victim's life.  *See People v. Adames*, 859 N.Y.S.2d 725, 726 (2d Dep't 2008) ("Although the complainant was stabbed in the chest and back, her wounds required no stitches and caused no damage to her organs, and . . . she was oriented, alert, had no trouble breathing, . . . and was identified as being in 'good' and 'stable' condition by medical staff.").

Although a close question, the Court finds the evidence presented insufficient to demonstrate either that Individual 1's stab wound was life-threatening or that any impairment of his lung was "protracted," NYPL § 10.00(10).  The body camera footage demonstrates that Individual 1 was standing on his own two feet, and able to communicate with police upon their arrival on the scene, minutes after the stabbing occurred.  One police officer describes his wound, which did not appear visible through his shirt, as just a "little one."  Approximately two hours after Individual 1 was admitted to Lincoln Hospital, the resident physician described Individual 1's condition as follows: "Breath sounds bilaterally, respirations nonlabored, no other signs of acute trauma on primary/secondary survey, good peripheral pulses, alert and oriented."  GX 4 at 5.  No protracted organ damage is documented in the medical records.  Although exploratory surgery revealed a "tiny apical pneumothorax," the records describe that as "clinically insignificant since patient breathing comfortably."  GX 4 at 7.  The Court, of course, recognizes that a four-centimeter stab wound of the lung is undoubtedly serious in the lay sense of the word, and is cognizant of the seriousness both of the injury and Mojica's actions.  But nothing in the record indicates that the injury was life-threatening or that Individual 1 faced a substantial risk of death absent medical

20

intervention.  As result, the evidence does not suffice to meet the statutory definition of serious physical injury.  Nor has the Government proffered evidence to suggest that Mojica acted with the specific intent to cause serious physical injury, as required by NYPL § 120.10(1).  The Court therefore concludes that there is insufficient evidence to find Mojica guilty of specification 2.

###    D.    Specification 3: Assault in the Third Degree

Specification 3 charges Mojica with violating NYPL § 120.00.  Pursuant to that statutory provision, "a person is guilty of assault in the third degree when . . . . [w]ith intent to cause physical injury to another person, he causes such injury to such person," NYPL § 120.00(1), or "he recklessly causes physical injury to another person, *id.* § 120.00(2).

The Court finds that the evidence clearly demonstrates that Individual 1 suffered physical injury, defined as "impairment of physical condition or substantial pain."  *Id.* § 10.00(9).  As documented in the medical records, Individual 1 suffered a four-centimeter stab wound in his back, which resulted in a three-day hospitalization and required staples.  Additionally, the Court concludes that Mojica caused such injury by stabbing Individual 1.  Individual 1's out-of-court identification of Mojica is corroborated by Mojica's various statements to the effect that he threw his life away for a bracelet, that he "retaliated" against someone, that he "caught" the "n---- with the bracelet," and that he knew the victim as a "get high budd[y]" from the neighborhood.

The only real question, then, is whether there is sufficient evidence that Mojica intended to injure Individual 1.  Under New York law, it is "well established that criminal intent may be inferred from the totality of the circumstances."  *People v. Madore*, 46 N.Y.S.3d 300, 303 (4th Dep't 2016); *see also People v. Mike,* 724 N.Y.S.2d 389 (4th Dep't 2001), *lv. denied*, 96 N.Y.2d 904.  Intent may also be inferred from the natural and probable consequences of a defendant's conduct.  *People v. Roman,* 787 N.Y.S.2d 568 (4th Dep't 2004), *lv. denied,* 4 N.Y.3d 802.  That

Mojica stabbed Individual 1 in the back in the midst of a fight that he started over a stolen bracelet leads the Court to the corollary finding of intent. The Court finds that "impairment of physical condition and substantial pain" are natural and probable consequences of the stabbing at hand.

The Court therefore finds Mojica guilty of assault in the third degree in violation of N.Y.P.L. § 265.03(3).

### E.    Specification 4: Criminal Possession of a Weapon in the Third Degree

The fourth specification charges Mojica with criminal possession of a weapon in the third degree, in violation of NYPL § 265.02. A person is guilty of that crime, when having previously been convicted of any crime, he "possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation, pistol or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another. *See* NYPL §§ 265.01(2); 265.02(1). As relevant here, New York Penal Law defines a "dangerous instrument" as "any instrument . . . which, under the circumstances, in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." NYPL § 10.00(13).

The Court credits Individual 1's statement that Mojica attacked him with a "knife." Individual 1 consistently described the weapon used to injure him as a knife—to the police upon their arrival on the scene, *see* GX-5, to Detective Grater the day after the incident, and to ADA Payyappilly in the subsequent days. That testimony is corroborated by photos and medical records which establish that Individual 1 suffered a four-centimeter stab wound. Together, the evidence suffices to establish that Mojica possessed a "dangerous knife" or "dangerous instrument" within the meaning of the statute. As explained in the context of Specification 3, the Court can infer from Mojica's use of that knife to stab Individual 1 the element of intent to use that knife unlawfully.

As it is undisputed that Mojica has previously been convicted of a crime, namely the violation of 18 U.S.C. § 922(g)(1) for which he is serving a term of supervised release, the Court finds him guilty of committing criminal possession of a weapon in the third degree in violation of NYPL § 265.02(1).

### F.      Specification 5: Menacing in the Second Degree

The fifth specification charges Mojica with second-degree menacing.  A person is guilty of that crime when "[h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."  NYPL § 120.14(1).  In determining whether fear would be a reasonable response to a defendant's actions, the Court should consider the circumstances facing the victim at the time in question, including any relevant knowledge the victim had about the actor.  *See, e.g., Mtr. of Kori W.*, 836 N.Y.S.2d 187 (1st Dep't 2007).

As noted above, the Court credits Individual 1's testimony that Mojica "pulled out a knife" in the midst of a physical altercation.  *See* GX 5, Defense Exhibit B.  The Court likewise credits the statements that, upon seeing the knife, Individual 1 turned his back in an attempt to flee.  The nature of Individual 1's injuries corroborate this account of what transpired in the altercation. These factual findings also allow the Court to reasonably infer that Mojica's display of the knife placed or attempted to place Individual 1 in reasonable fear of a physical injury.  In light of the context in which this display occurred, in the midst of a fight started by Mojica, the Court finds that fear would be a reasonable response.  Lastly, Mojica's intent to cause fear of physical injury can be inferred as the natural consequence of using a knife during a fight.

Accordingly, the Court finds Mojica guilty of menacing in the second degree in violation of NYPL § 120.14(1).

### G.     Specification 6: Harassment in the Second Degree

The sixth and final specification stemming from the March 29, 2020 stabbing charges Mojica with second degree harassment.  A person is guilty of that crime when, "with intent to harass, annoy or alarm another person . . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." NYPL § 240.26(1).

The Court's finding that Mojica stabbed Individual 1 satisfies the conduct element of that crime, leaving only the question as to whether Mojica acted with the requisite intent.  In this case, the Court finds that Mojica's statements to the effect that he "retaliated" on Individual 1, *see* GX 1C-T at 3:7-8, that "n---- did something. I let what that n---- did to me, I let that go too far with it," and that he "caught" "the n--- with the bracelet," *see* GX 1H-T at 1:19-25, provide direct evidence that his actions were intended to harass Individual 1 about his alleged theft of the bracelet. That intent can also be inferred from Mojica's initiation of a fight and brandishing of a knife.

The Court therefore finds Mojica guilty of violating NYPL § 240.26(1).

## III.    Specifications 7-10: Witness Tampering Conspiracy

Specifications 7 through 10 charge Mojica with conspiracy to commit various forms of witness tampering.  In each instance, the allegations hinge on Mojica's own statements made during the jail calls.  The Government asks the Court to infer from those statements a conspiracy between Mojica and Rick to induce Individual 1, by intimidation and bribery, not to testify.  Mojica challenges that interpretation of the evidence, arguing that his statements indicate a desire to prevent Individual 1 from continuing to lie about what happened on the street.  Additionally,

Mojica maintains that the Government has not met its burden of proving an overt act, a required element of conspiracy under New York law.  The Court addresses that question first.

### A.      Overt Act

Under New York law, a "person shall not be convicted of conspiracy unless an overt act is alleged and proven to have been committed by one of the conspirators in furtherance of the conspiracy."  NYPL § 105.20.  Although the penal law does not specify the type of conduct contemplated by the overt-act requirement, the New York Court of Appeals has stated that "[t]he overt act must be an independent act that tends to carry out the conspiracy, but need not necessarily be the object of the crime." *People v. Ribowsky*, 77 N.Y.2d 284, 293 (1991) (holding that perjury concealing conspiracy was cognizable overt act).   Proof of an overt act provides assurance "'that the conspiracy is at work . . .  and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence.'" *Id.* (quoting *Yates v. United States,* 354 U.S. 298, 334 (1957)).  Although the act need not be unlawful in and of itself, "it must be a step towards the execution of the conspiracy and not simply a part of the agreement." *People v. Menache*, 470 N.Y.S.2d 171, 172 (2d Dep't 1983).  Accordingly, the *Menache* court concluded that a telephonic conversation may constitute an overt act in furtherance of a conspiracy, as long as it tends to carry out the object of the conspiracy; mere "conversations between two coconspirators," however, do not suffice. *Id.*

When asked by the Court to identify evidence of any overt act in furtherance of the alleged conspiracy to tamper with Individual 1 as a witness, the Government cited two examples:  Mojica's reference to sending a "kite" or letter to Rick, as well as other statements indicating that Rick did in fact attempt to locate Individual 1.  Finding that the record establishes, by a preponderance of the evidence, that Rick made inquiries as to the whereabouts of Individual 1, the Court concludes

that the Government has satisfied its burden of proving an overt act.   In light of this conclusion, the Court does not address whether the evidence that Mojica sent a kite or letter to Rick suffices to establish an overt act in furtherance of a conspiracy to tamper with a witness.

The principal evidence from which the Court can infer that Rick acted on the agreement to tamper with Individual 1 are statements made during the April 29, 2020 phone call.  During that call, which took place a little more than two weeks after Mojica initially instructed him to contact Individual 1,  Rick states that he has been "down there every day," that he's "been asking and shit" and that people have told him that "they haven't seen him neither."[1]   GX  1P-T, 3:19-4:10. Although Rick indicates that he has not been able to contact Individual 1 as of yet, *see id.*, and subsequent calls further suggest that Rick has not succeeded in consummating the agreement— including, for example, a May 24, 2020 statement by Mojica that he calls Rick "[e]very now and then . . . because I been trying to get him to holla at homeboy," GX 1V-T at 1:3-4—the Court finds Rick's statements sufficient to establish that he made inquiries as to Individual 1's whereabouts. Such an action qualifies as an act in furtherance of the agreement to prevent Individual 1 from testifying, and provides assurance that the conspiracy was "at work," *Yates,* 354 U.S. at 334.   The Court thus finds the evidence sufficient to demonstrate an overt act in furtherance of the conspiracy.

### B.    Specification 7:  Conspiracy to Bribe a Witness

Specification 7 charges Mojica with conspiracy to bribe a witness.  Pursuant to NYPL § 215.00,

> A person is guilty of bribing a witness when he confers, or offers or agrees to confer, any benefit upon a witness or a person about to be called as a witness in any action or proceeding upon an agreement or understanding that (a) the testimony of such witness will

---

[1] These and numerous other statements are admissible not only as party-opponent statements but also as statements made by a coconspirator during and in furtherance of the conspiracy under Fed. R. Evid. 801(d)(2)(E).  *See Carthen*, 681 F.3d at 100.

thereby be influenced, or (b) such witness will absent himself from, or otherwise avoid or seek to avoid appearing or testifying at, such action or proceeding.

A person is guilty of conspiracy when "with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." NYPL § 105.00. The elements of a conspiracy offense comprise "first, the specific intent that a crime be performed; and second, an agreement with another person to engage in or cause that crime to be performed." *People v. Reyes*, 31 N.Y.3d 930, 931 (2018) (internal quotation marks omitted).

Under this standard, in order for the Court to find Mojica guilty of Specification 7, the evidence must demonstrate that Mojica agreed with one or more persons to offer some kind of benefit upon Individual 1 with the intent to cause Individual 1 to absent himself from cooperation with law enforcement. The Court finds that the evidence contained in Government Exhibit 1 satisfies those elements. First, Mojica's intentions to confer a monetary benefit on Individual 1 are well-documented in the jail calls, as indicated by his references to "dropp[ing] a bag," GX 1I-T at 2:4-5, or his statements to the effect that "I'm probably gonna have to offer that n---- some money or something," GX 1E-T at 3:11-14. Moreover, the ultimate goal of such payment, to prevent Individual 1 from testifying, is not only easily inferred from the circumstances, but also directly evidenced by Mojica's statements to the effect that he hopes "homeboy don't show up in court," GX 1A-T at 4:2, and his reference to Rick as "the key to getting me out of here," GX 1-S. Second, the April 13, 2020 call provides direct evidence of an agreement between Mojica and Rick. Mojica instructs Rick to "drop a bag," to which Rick responds in assent. *See* GX 1I-T. The existence of this agreement is reiterated on multiple occasions in the ensuing weeks in which Mojica either instructs Rick to seek out Individual 1, or complains to his female interlocutors about Rick's failures to follow through with the arrangement. As explained above, the statements

evidencing Rick's on-the-street inquiries about Individual 1's whereabouts satisfy the overt-act requirement.

Finding the required elements of agreement, specific intent, and overt act satisfied, the Court finds Mojica guilty of Specification 7.

### C.     Specifications 8 and 9

The eighth and ninth specifications charge Mojica with tampering or intimidating a witness through violence or the threat of violence.  As relevant to Specification 8, "[a] person is guilty of tampering with a witness in the third degree when, knowing that a person is about to be called as a witness in a criminal proceeding . . . . [h]e wrongfully compels or attempts to compel such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at such proceeding by means of instilling in him a fear that the actor will cause physical injury to such person."   NYPL § 215.11.   Similarly, Specification 9 charges Mojica with third-degree intimidation of a victim or witness.  A person is guilty of that crime when, knowing that that person possesses information relating to a criminal transaction, he either wrongfully compels or attempts to compel such person to refrain from communicating with authorities "by means of instilling in him a fear that the actor will cause physical injury to such other person or another person," or "[i]ntentionally damages the property of such other person . . . for the purpose of compelling such other person or another person to refrain from communicating . . . information relating to that criminal transaction" to any authority.  *Id.* § 215.15.

Here, the Court finds the evidence insufficient to establish that the scope of the agreement between Mojica and Rick included instilling in Individual 1 a fear of physical injury, or indeed any violent act.  Although the evidence is sufficient to establish that Rick intended to bribe Individual 1, the Court cannot infer an intent to intimidate solely from Mojica's exhortations for

Rick to "holler at" or "pull up on" Individual 1.  Both "holler" and "pull up on" are susceptible of multiple potential meanings, including threats, fighting, or acts of violence.  But as no evidence was introduced as to their specific meaning in this context, the Court will not interpret them to signify an intent to instill fear of physical injury in this instance.  Nor does the evidence allow the Court to attribute Individual 1's fear of retaliation on the streets, as described by ADA Payyappilly, to the agreement between Mojica and Rick.

Finding the evidence presented insufficient to demonstrate that the agreement encompassed the necessary element of instilling fear of physical injury—or intentional damage of property—the Court finds Mojica not guilty of Specifications 8 and 9.

### D.    Specification 10: Conspiracy to Tamper with a Witness in the Fourth Degree

The tenth and final specification charges Mojica with conspiracy to commit fourth-degree witness tampering.  As relevant here, a person is guilty of that substantive crime when, "knowing that a person is or is about to be called as a witness in an action or proceeding, . . . he wrongfully induces or attempts to induce such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at, such action or proceeding."  NYPL § 215.10.

As an initial matter, the knowledge element is satisfied by Mojica's repeated statements to the effect that he hoped Individual 1 would not show up in court, and by other statements that demonstrate his knowledge about the importance of Individual 1's participation to the progress in his state prosecution, *see, e.g.,* GX 1O-T at 2:24-3:3 ("[T]he only way I'ma get out of this is if [Rick] go fix this."); GX 2A-T at 1:2 ("The dude didn't show up for Grand Jury, so.").   The Court finds that the evidence of the agreement to bribe Individual 1, *see* Part III.B, also suffices to establish that the agreement encompassed the intent to "induce" Individual 1 to "absent himself" from testifying at a criminal proceeding.  Similarly, the evidence of Rick's efforts to track down

Individual 1 is sufficient to demonstrate an overt act in furtherance of the conspiracy to induce his absence.

The Court therefore finds Mojica guilty of specification 10.

## CONCLUSION

The Court adjudges Mojica to be guilty of violating Specifications 3, 4, 5, 6, 7, and 10 in the Amended Violation Report and not guilty of violating Specifications 1, 2, 8, and 9.   Sentencing on the violations is scheduled for Friday, April 2, 2021 at 9:00 a.m.   Defendants shall submit any sentencing materials by no later than March 23.   The Government shall submit its submissions by March 30.

SO ORDERED.

Dated:     March 16, 2021
           New York, New York

_____
Ronnie Abrams
United States District Judge

30